## STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 08-932

**FAYE O. JEANSONNE**

**VERSUS**

**NEW YORK LIFE INSURANCE COMPANY, ET AL.**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 2001-4587, DIVISION E
HONORABLE HERMAN C. CLAUSE, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## ULYSSES GENE THIBODEAUX
## CHIEF JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Billy Howard Ezell, and James T. Genovese, Judges.

**AFFIRMED.**

**Samuel E. Masur**
**Christopher B. Bailey**
**Gordon, Arata, McCollam, Duplantis & Egan, LLP**
**P. O. Box 81829**
**Lafayette, LA 70598**
**Telephone: (337) 237-0132**
**COUNSEL FOR:**
 **Defendant/Appellee - OMNI Energy Services Corp.**

**James M. Garner**
**Peter L. Hilbert, Jr.**
**Joshua S. Force**
**Sher Garner Cahill Richter Klein & Hilbert, L.L.C.**
**909 Poydras - 28th Floor**
**New Orleans, LA 70112**
**Telephone: (504) 299-2100**
**COUNSEL FOR:**
 **Defendant/Appellee - Nutmeg Insurance Company**

**Ted Warren Hoyt**
**D. Reardon Stanford**
**Hoyt & Stanford, LLC**
**315 S. College Road - Suite 165**
**Lafayette, LA 70503**
**Telephone: (337) 234-1012**
**COUNSEL FOR:**
**Defendant/Appellee - Succession of David Jeansonne**

**John Walter Hutchinson**
**Lamont P. Domingue**
**Voorhies & Labbe**
**P. O. Box 3527**
**Lafayette, LA 70502-3527**
**Telephone: (337) 232-9700**
**COUNSEL FOR:**
**Plaintiff/Appellee - Faye O. Jeansonne**

**Maura Z. Pelleteri**
**Thomas M. Beh**
**Andrea A. Mittleider**
**Krebs, Farley & Pelleteri, P.L.L.C.**
**400 Poydras Street - Suite 2500**
**New Orleans, LA 70130**
**Telephone: (504) 299-3570**
**COUNSEL FOR:**
**Defendant /Appellee - New York Life Insurance Company**

**André F. Toce**
**P. O. Box 158**
**Broussard, LA 70518**
**Telephone: (337) 233-6818**
**COUNSEL FOR:**
**Defendant/Appellant - Dixie Chris Omni, L.L.C.**

**Michael J. Juneau**
**Sue Nations**
**Juneau David, APLC**
**P. O. Drawer 51268**
**Lafayette, LA 70505-1268**
**Telephone: (337) 269-0052**
**COUNSEL FOR:**
**Defendant/Appellee - Edward D. Langley**

**David P. Salley**
**Maria Najwa Rabieh**
**Salley, Hite & Mercer, LLC**
**365 Canal Street - Suite 1710**
**New Orleans, LA 70130**
**Telephone: (504) 566-8836**
**COUNSEL FOR:**
**Defendant/Appellee - Zurich American Insurance Company**

**Cole J. Griffin**
**202 West Main Street**
**Lafayette, LA 70501**
**Telephone: (337) 706-7460**
**COUNSEL FOR:**
**Defendant/Appellant- Dixie Chris Omni, L.L.C.**

**THIBODEAUX, Chief Judge.**

Appellant investor, Dixie Chris Omni, L.L.C. (Dixie), asserted fraud claims against the estate of David Jeansonne, the deceased chief executive officer (CEO) of OMNI Energy Services Corporation (OMNI), and against Jeansonne's life insurance agent, Edward D. "Denny" Langley, who was dismissed from the suit in 2005. Dixie brought claims of vicarious liability against New York Life Insurance Company (New York Life), as the employer of Langley, and brought claims against Zurich American Insurance Company (Zurich), as Langley's errors and omissions (E&O) insurer. Zurich was dismissed from this suit in 2006.

Dixie also brought claims of negligence against two directors of OMNI. The directors were dismissed as the result of a settlement. Dixie further brought claims against Nutmeg Insurance Company (Nutmeg), as the liability (D&O) insurer of the directors and officers of OMNI, including the deceased CEO, Jeansonne, and the two dismissed OMNI directors.

The trial court granted motions for summary judgment in favor of the two remaining defendants, Nutmeg and New York Life, dismissing Dixie's suit in its entirety. Dixie timely appealed the 2008 judgment dismissing Nutmeg and New York Life, and an order of appeal was issued as to that judgment. However, Dixie's appellate brief included argument seeking to appeal the 2005 judgment dismissing Langley and the 2006 judgment dismissing Langley's E&O insurer, Zurich. The current and dismissed defendants filed motions to dismiss and motions to strike the attempted appeals of the 2005 and 2006 judgments. As more fully set forth below, we grant the motions to strike from Dixie's appellate brief all argument regarding the 2005 and 2006 judgments, and we affirm the 2008 judgment of the trial court dismissing Dixie's suit.

## I.

### ISSUES

We shall decide:

(1)     whether the appellate issues regarding the 2005 and 2006 judgments dismissing Langley and Zurich should be stricken from the appellant/Dixie's brief;

(2)     whether the trial court erred in granting summary judgment to New York Life;

(3)     whether the trial court erred in granting summary judgment to Nutmeg on the issue of duty; and

(4)     whether the trial court erred in granting summary judgment to Nutmeg on the issue of the Integration Clause in the Stock Purchase Agreement.

## II.

### FACTS AND PROCEDURAL HISTORY

Dixie is a one-member limited liability company set up by André Toce for the specific purpose of purchasing and holding stock in OMNI.  Late in the evening on October 31, 2000, after negotiating the prior day and for approximately fifteen hours on the 31st, Dixie entered into a Stock Purchase Agreement with OMNI, investing $2,000,000.00 in OMNI stock.  At the time of the negotiations, OMNI stock was valued at less than $1.00 per share (approximately $.63 per share) and was on the verge of being delisted by the regulating authority.  Jeansonne was returning to OMNI as its chief executive officer with a specific plan to increase the value of the company's stock.  He had raised the stock to $27.00 per share in the past.  His abilities in this area made him the key figure in the negotiations.  Accordingly, Dixie was to receive certain assignments of life insurance on Jeansonne to guarantee Dixie's investment in the event that anything should happen to Jeansonne before he

2

was able to increase the value of the stock. The life insurance policies on Jeansonne were written by New York Life through its agent, Edward D. "Denny" Langley.

Langley met with his client, Jeansonne, and briefly attended some of the meetings on October 31, 2000. At Jeansonne's request, Langley delivered two assignments to Jeansonne, one of which covered three pre-existing personal policies of Jeansonne's, hereinafter referred to as the "Jeansonne policies," having a total principle value of approximately $850,000.00. The beneficiary on these three Jeansonne policies was Faye Jeansonne, David Jeansonne's former wife. The second assignment was based upon a new "key man" policy being applied for by OMNI through Langley at the time of the negotiations. The beneficiary on this policy was to be OMNI; this policy is referred to as the "OMNI" or "key man" policy. The OMNI policy was to fund the stock "put option" in the Stock Purchase Agreement,[1] also being drafted on the 31st. The life insurance application that was written on that date was for $15,000,000.00. However, it was later determined that this amount exceeded new coverage amounts allowed by New York Life under the circumstances. A new application for $7,500,000.00 was subsequently filed and accepted by New York Life, and the coverage was written and delivered.

During the fifteen hours of negotiation on October 31, 2000, Dixie was represented by its owner, André Toce, its certified public accountant and financial advisor, Michael DeHart, and Dixie's attorney, John Anjier. DeHart and Anjier were working on various elements of the Stock Purchase Agreement in OMNI's offices throughout the building, and were in and out of the room during discussions between Toce and Jeansonne. Toce, an attorney himself, was reportedly on the phone at many points during the negotiations, and Jeansonne at times was actually being examined

---

[1] The Stock Purchase Agreement reflected that for $2,000,000.00, Dixie purchased 3,200,000 shares of OMNI stock with options to purchase over a million additional shares.

3

by medical personnel who had been called to OMNI to give the 40-year-old Jeansonne a physical examination in furtherance of obtaining the new key man coverage. Also present at various times during the meeting was Burt Zaunbrecher, an investor and officer of OMNI.[2]

A few months later, in February 2001, Jeansonne died in a plane crash. A dispute arose between Dixie and Faye Jeansonne, the holder and beneficiary of the three personal Jeansonne policies, over the proceeds of this life insurance. Faye Jeansonne filed suit against New York Life and Dixie. New York Life deposited the proceeds of the disputed life insurance policies, approximately $924,000.00, into the registry of the court. Over the next few years, the parties filed numerous reconventional demands, cross-claims, and third-party demands. Faye Jeansonne filed a motion for summary judgment, asserting that the proceeds on the three Jeansonne policies in her possession, and the funds in the registry of the court, were owed to her because Dixie never took delivery of the policies, a requirement under La.Civ.Code arts. 3152 and 3158.

Therefore, Faye Jeansonne argued, as an assignee *without* possession, Dixie had no valid claim to the funds. She further argued that her former husband, David Jeansonne, had expected and asked for a release from Dixie of the "temporary" assignment of the three smaller Jeansonne policies when the larger key man policy was issued and delivered to OMNI. Dixie ultimately settled with Faye Jeansonne, accepting twenty percent of the proceeds of the three policies for Dixie's portion, and allowing Faye Jeansonne to collect eighty percent of the funds in the registry of the court.

---

[2]In addition to Dixie's investment of $2,000,000.00 on October 31, 2000, seven other investors, apparently on the previous day, agreed to invest between $100,000.00 and $250,000.00 each. The amount needed by OMNI was $5,000,000.00, which was accomplished by Jeansonne through Dixie, and the other investors.

In the meantime, Dixie's pleadings asserted claims of negligent misrepresentation and other tortious acts and omissions against the estate of David Jeansonne, stating that Jeansonne had failed to effect valid collateral assignments in exchange for Dixie's $2,000,000.00. Dixie alleges that it was given assurances by Jeansonne and was led to believe by Jeansonne that the three personal policies listed on the first collateral assignment had a value of $2,000,000.00 and that Dixie should have received $2,000,000.00 upon the death of Jeansonne. The collateral assignment itself lists the three policies by policy number, but does not reflect the dollar amounts of the policies. The Jeansonne assignment also does not show, on its face, any indication of the value of the assignment. Because Dixie did ultimately receive just under $200,000.00 from those policies through settlement with Faye Jeansonne, Dixie's claim is for the difference between the amount received and the $2,000,000.00 that it expected to receive, approximately $1,800,000.00.

Following Dixie's original answer, reconventional demand, cross-claim, and third-party demand, Dixie filed seven (7) amended pleadings over a five-year period. In its first supplemental pleading in 2002, Dixie complained that New York Life agent Langley had aided and abetted Jeansonne in misleading Dixie during the 2000 negotiations regarding the value of the collateral assignments, but Dixie did not name Langley as a third-party defendant until February 2005. Dixie asserted that Langley's negligent misrepresentations amounted to malfeasance and that Langley had practiced a "deceit upon Dixie." Langley filed an exception of peremption, which was granted, and Langley was dismissed in August 2005. Other amended pleadings named Langley's insurer, Zurich, as a defendant. Zurich's motion for summary judgment was granted, and Zurich was dismissed in August of 2006.

5

In 2005, Dixie had also amended to add two directors of OMNI who were not present at the October 2000 meeting, William W. Rucks, IV and John H. Untereker, asserting claims against them for negligent supervision of OMNI's CEO, Jeansonne. Dixie subsequently settled with the two directors without ever having effected service upon them. In Dixie's last amended pleading in April 2007, Dixie named OMNI's D&O liability carrier, Nutmeg, as a defendant, asserting Nutmeg's liability for the acts and omissions of Jeansonne, Rucks, and Untereker. The only other remaining defendant, besides Nutmeg, was New York Life, against whom Dixie asserted claims of vicarious liability for the fraudulent and intentional or negligent misrepresentations of its agent, Denny Langley.

New York Life filed one comprehensive motion for summary judgment, and Nutmeg filed three motions for summary judgment or partial summary judgment, separating the issues of duty, damages, and an issue revolving around the Integration Clause in the Stock Purchase Agreement. In February 2008, the trial court granted all motions for summary judgment, and both Nutmeg and New York Life were dismissed with prejudice. Dixie appealed the February 2008 judgment dismissing Nutmeg and New York Life. In Dixie's appellate brief, it argued for reversal of not only the February 2008 judgment, but also the 2005 and 2006 judgments dismissing Langley and his liability insurer, Zurich, respectively. Langley, Zurich, and New York Life seek to have us dismiss or strike Dixie's attempted appeals of the 2005 and 2006 judgments.

## LAW AND DISCUSSION

### Standard of Review

A motion for summary judgment will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that mover is entitled to judgment as a matter of law." La.Civ.Code art. 966(B); *Sher v. Lafayette Ins. Co.*, 07-2441, p. 5 (La. 4/8/08), 988 So.2d 186, 192 (quoting *Huggins v. Gerry Lane Enter., Inc.*, 07-2443, 06-2816, 06-2848, p. 2 (La. 5/22/07), 957 So.2d 127, 128). "This court reviews a grant or denial of a motion for summary judgment *de novo*." *Id.* Thus, the reviewing court asks the same questions as does the trial court in determining whether summary judgment is appropriate, i.e., whether there is any genuine issue of material fact and whether the mover is entitled to judgment as a matter of law.

### 2005 Langley Judgment and 2006 Zurich Judgment

Dixie seeks to appeal the August 2005 judgment dismissing Langley and the August 2006 judgment dismissing Langley's liability insurer, Zurich. The defendants argue that both judgments were final judgments under La.Code Civ.P. art. 1915(A) and, therefore, subject to an immediate appeal, for which delays have run on both judgments. In its Statement of Jurisdiction, Dixie argues that the Langley and Zurich judgments were partial final judgments under La.Code Civ.P. art. 1915(A)(1) but were not designated as final pursuant to La.Code Civ.P. art. 1915(B)(1). Thus, these judgments can be appealed along with the final judgment dismissing Nutmeg and New York Life. One clear problem in Dixie's argument is that a final judgment

under La.Code Civ.P. art. 1915(A) does not have to be designated as such. The Louisiana Code of Civil Procedure provides as follows:

> **La.Code Civ.P. art. 1915. Partial final judgment; partial judgment; partial exception; partial summary judgment**
>
> A. A final judgment may be rendered and signed by the court, even though it may not grant the successful party or parties all of the relief prayed for, or may not adjudicate all of the issues in the case, when the court:
>
> (1) *Dismisses the suit as to less than all of the parties*, defendants, third party plaintiffs, third party defendants, or intervenors.
>
> . . . .
>
> B. (1) When a court renders a partial judgment or partial summary judgment or sustains an exception in part, as to one or more but less than all of the *claims, demands, issues, or theories*, whether in an original demand, reconventional demand, cross-claim, third party claim, or intervention, the judgment shall not constitute a final judgment unless it is designated as a final judgment by the court after an express determination that there is no just reason for delay.
>
> (2) In the absence of such a determination and designation, any order or decision which adjudicates fewer than all claims or the rights and liabilities of fewer than all the parties, shall not terminate the action as to any of the claims or parties and shall not constitute a final judgment for the purpose of an immediate appeal. Any such order or decision issued may be revised at any time prior to rendition of the judgment adjudicating all the claims and the rights and liabilities of all the parties.
>
> C. If an appeal is taken from any judgment rendered under the provisions of this Article, the trial court shall retain jurisdiction to adjudicate the remaining issues in the case.

La.Code Civ.P. art. 1915 (emphasis added).

The August 2005 judgment dismissing Langley after granting his exception of peremption is a final, immediately appealable judgment because, under

La.Code Civ.P. art. 1915(A)(1), it dismisses the *suit* as to one *party*, which is "less than all of the parties, defendants, third party plaintiffs, third party defendants, or intervenors." Generally speaking, Article 1915(A)(1), governing final judgments, applies to the dismissal of *parties*, while Article 1915(B)(1), governing interlocutory judgments, applies to the resolution of *issues*. Under Article 1915(B), a judgment is interlocutory and not immediately appealable unless the trial court designates it as final; but if one party is completely dismissed from a suit, the judgment is final under Article 1915(A)(1), and there is no requirement to have it designated as final. More specifically, the 1999 "Comment" to Article 1915 states as follows:

> The language in 1915(B)(1) is amended to eliminate confusion with Article 1915(A) by the elimination of "parties" from (B)(1). A partial final judgment under Article 1915(B) is appealable only if so designated by the court. See Banks v. State Farm [sic], 708 So.2d 523 (2 Cir. 1998). A final judgment under Article 1915(A) is appealable without being so designated, except for a partial summary judgment under Article 966(E). A partial summary judgment under Article 966(E) is covered under Article 1915(B). See C.C.P. Art. 1911.

Dixie argues that the legislature did not remove the word "parties" from Article 1915(B)(2), and, therefore, the Langley judgment is a non-designated interlocutory judgment reviewable on appeal with the final judgment. However, to follow Dixie's interpretation of the Langley judgment as an interlocutory judgment under 1915(B)(2) would negate 1915(A)(1). We interpret (B)(2) in conjunction with (B)(1), which discusses a *partial* exception as being interlocutory. This means that when one party gets only part of the relief requested, such that the same party is not dismissed from the suit, the judgment is interlocutory, if the court does not designate otherwise. Langley's full dismissal on the granting of his exception of peremption was not a partial exception that adjudicated "fewer than all claims" against him. It adjudicated *all* claims against Langley, and he was dismissed as a defendant from the

suit. This fits squarely under 1915(A)(1) as an immediately appealable final judgment as to Langley.

A judgment that dismisses a party from a suit without adjudicating all of the issues in a case is a partial final judgment subject to an immediate appeal without the need of the trial court's certification as such. La.Code Civ.P. art. 1915(A)(1); *Cavalier v. Rivere's Trucking, Inc.*, 03-2197 (La.App. 1 Cir. 9/17/04), 897 So.2d 38. *Cavalier* seems to be most factually analogous to the present case. There, in a personal injury action brought against a sugar mill, the driver of a tractor-trailer, and the owner of the tractor-trailer, the trial court granted summary judgment dismissing the sugar mill defendant from the suit with prejudice. The first circuit determined that the judgment was a partial final judgment subject to immediate appeal. Because no timely appeal was taken from the judgment, the appellate court lacked jurisdiction with regard to any issues concerning the propriety of that judgment.

The *Cavalier* court cited its earlier decision in *Motorola, Inc. v. Associated Indemnity Corp.*, 02-0716 (La.App. 1 Cir. 4/30/03), 867 So.2d 715, where the Louisiana First Circuit Court of Appeal, sitting en banc, held that summary judgment granted to one insurer was a partial final judgment, immediately appealable, and it did not require the court's designation or certification of the judgment as final.

The *Motorola* court provided the following extensive analysis of legislative intent:

> The divergent interpretations of the necessity of certification of partial judgments alone demonstrate the ambiguity of article 1915's language. Under the general rules of statutory construction where such ambiguity exists, courts begin their review with the premise that legislation is the solemn expression of legislative will, and, therefore, the interpretation of the law involves, primarily, the search for the legislature's intent. *See Cole-Miers Post 3619*

10

*V.F.W. of DeRidder v. State, Department of Revenue & Taxation*, 99-2215, p. 3 (La. 1/19/00), 765 So.2d 312, 314. *See also* La. C.C. arts. 2, 10.

The present version of La. C.C.P. art. 1915, as amended by Acts 1999, No. 1263, § 1, became effective as to all actions filed on or after January 1, 2000. Prior to that effective date, article 1915(B)(1) provided that its certification requirement applied to any partial judgment "as to one or more but less than all of the claims, demands, issues, theories, *or parties*." The official Comment relating to the 1999 amendments states that the purpose of the change was "to eliminate confusion with Article 1915(A) by the elimination of 'parties' from (B)(1)." La. C.C.P. art. 1915, Comment 1999. Thus, it would seem that a judgment adjudicating all claims relating to "one or more but less than all of the . . . parties" would henceforth be governed by article 1915(A).

That the above-described result is what the legislature intended is confirmed by examination of the pertinent legislative history. Intent expressed at the appropriate legislative committee meetings is an aid to the courts in determining the true legislative intent and purpose behind the law. *Bridges v. Smith*, 01-2166, p. 5 (La.App. 1st Cir. 9/27/02), 832 So.2d 307, 311[, *writ denied*, 02-2951 (La. 2/14/03), 836 So.2d 121]. House Bill No. 780, which, as amended, was enacted as Acts 1999, No. 1263, § 1, was proposed by the Louisiana State Law Institute, pursuant to its statutory duty "[t]o consider needed improvements in both substantive and adjective law and to make recommendations concerning the same to the legislature." La.R.S. 24:204(A)(1). Among the extensive recommendations made were the elimination of the word "parties" from La. C.C.P. art. 1915(B)(1) and exclusion of summary judgments rendered pursuant to La. C.C.P. art. 966(E) from article 1915(A)(3). The minutes of the House Committee on Civil Law and Procedure relating to House Bill No. 780 are particularly revealing:

> Professor [Howard W.] L'Enfant [of the Louisiana State University Law Center] . . . explained the changes to Article 1911, which would clarify the appealability of final judgments and partial final judgments and specify that (1) a partial judgment pursuant to C.C.P. Art. 1915(A), other than a partial summary judgment, is appealable without more, and (2) a partial judgment under C.C.P. Art. 1915(B), and a partial summary

judgment, are appealable only if designated by the court.

Professor L'Enfant continued with the changes to Article 1915 which would clarify the confusion that presently exists. Article 1915(A) specifies those partial final judgments that are appealable and article 1915(B) describes other partial judgments which may or may not be final appealable judgments, depending on whether so designated by the trial court. He stated that the problem with the way Article 1915(B) is written is an overlap with respect to Article 1915(A). Article 1915(A) provides that if a final judgment dismisses a party, it is an appealable judgment, but Article 1915(B)(1) provides that, when a court renders a partial judgment or a partial summary judgment as to one or more but less than all of the parties, then it is not a final judgment unless specified as such by the court. Therefore, a judgment that dismisses a party must designate whether it would be appealable under (A)(1) or it was not appealable under (B)(1). Professor L'Enfant stated that the bill would strike "or parties" from (B)(1) and return the law as it was before the adoption of (B)(1), which was that *whenever a judgment dismisses a party, that judgment is a partial final judgment and would be appealable*.

\* \* \*

Representative McMains [co-author of Bill No. 780 and committee chairman] explained that *the net effect of the changes to Article 1915 would be that a partial final judgment would unquestionably exist whenever a party were [sic] dismissed*, but as to a partial summary judgment that dismissed an issue or cause of action, the court would be required to certify that it was indeed a partial final judgment.

\* \* \*

Professor L'Enfant agreed with Representative McMains' statement, that the courts of appeal have taken very seriously the

language in Article 1915(B)(1) and have said that, without reasons from the trial court stating why an appealable partial judgment should exist, the appeal courts are prepared to dismiss the appeal as inappropriate. Therefore, the language of the bill is reinforced by the opinions of the courts of appeal that have been rendered so far. (Our emphasis.)

Commentators have expressed the view, consistent with the foregoing expressions of the legislative purpose, that the 1999 amendment to La. C.C.P. art.1915 served "the purpose of making a judgment dismissing one or more but not all of the parties immediately appealable under Article 1915A without the necessity of designation by the trial court as a final judgment under Article 1915B." 1 Frank L. Maraist and Harry T. Lemmon, *Louisiana Civil Law Treatise: Civil Procedure* § 14.3(1) (1999 ed., 2002 pocket part). *See also* Roger A. Stetter, *Louisiana Civil Appellate Procedure*, § 3.18 (2002 ed.). At this time, it would appear that the prevailing rule in the Second and Fourth Circuits is in accord with this interpretation, while the Third and Fifth Circuits have generally held that a judgment dismissing less than all the parties is controlled by article 1915(B)(1).

*Id.* at 719-20 (footnotes omitted) (first alteration ours).

Dixie asserts that this court continues to hold differently, choosing not to follow *Motorola*. However, since the 2003 publication of *Motorola*, the fifth and the third circuits have rendered decisions consistent with the above interpretation. In *Strother v. Continental Casualty Co.,* 05-1094 (La.App. 3 Cir. 11/16/05), 917 So.2d 551, *rev'd on other grounds*, 06-302 (La. 6/2/06), 930 So.2d 948, a panel of this court discussed in detail the amendments to La.Code Civ.P. art. 1915 and found that where the "judgment on the jury's verdict disposed of the entirety of the plaintiffs' suit against these defendants, this judgment was immediately appealable and did not need designation by the trial court to be rendered appealable." *Strother*, 917 So.2d at 555. Hence, the third circuit's decision is consistent with *Motorola.* However, the facts in *Strother* were complicated by the fact that on the same day that

the defendants filed their appeal, they also filed a pleading to amend the judgment to incorporate oral agreements "entered into between the parties and the court, and to designate [only] the *amended* judgment as appealable." *Strother v. Cont'l Cas. Co.*, 06-302 (La. 6/2/06), 930 So.2d at 948 (emphasis added).

The Louisiana Supreme Court reversed our finding in *Strother* under 1915(A) for what appears to be factual reasons, finding that the partial judgment was signed on "a part of" the principal demand against one set of defendants, rendering it a (B)(2) judgment that required designation. *Strother*, 930 So.2d 948. Neither decision discusses the language in the original judgment or what the judgment adjudicated, but the supreme court went on to articulate that it was "apparent from the record that all of the parties believed the original judgment was a partial, non-final judgment which could be amended." *Id.* at 950.

In *Bell v. American International Group*, 06-1242 (La.App. 3 Cir. 2/7/07), 950 So.2d 164, a panel of this court found that the judgment constituted a final judgment because it dismissed all claims against one defendant but had no effect on the remaining claims against the other defendants. In *Bell*, the trial court had titled the judgment "Final Judgment." The error argued on appeal was that the designation did not conform to La.Code Civ.P. art. 1915(B) because it did not expressly state that there was no just reason to delay the immediate appeal. After conducting a de novo review, a panel of this court agreed that the judgment was final and appealable but did not specifically address the fact that Article 1915(A)(1) required no designation.

The fifth circuit in *Riehm v. State Farm Mutual Automobile Insurance Co.*, 07-651 (La.App. 5 Cir. 1/22/08), 977 So.2d 1045, *writ denied*, 08-387 (La. 4/18/08), 978 So.2d 350, found that the judgment dismissing an injured motorist's petition as to the driver, auto owner, and liability insurer was a final and immediately

appealable judgment, even though the motorist's claim for UM benefits was still pending in the trial court, and even though the judgment was not designated as being immediately appealable. Since the judgment dismissed a party, it was final and appealable without the necessity of designation. *Id. See also* La.Code Civ.P. arts. 1911, 1915(A)(1), (B); *Bordelon v. Avondale Indus., Inc.*, 03-228 (La.App. 5 Cir. 5/28/03), 846 So.2d 993, *writ denied*, 03-2074 (La. 11/7/03), 857 So.2d 497. In *Bordelon*, 846 So.2d 994, footnote 4 provides: "The trial court designated the judgment for appeal pursuant to La. C.C.P. art. 1915(B)(1). However, the judgment is appealable pursuant to La. C.C.P. art. 1915(A)(1), because as a judgment that dismissed a party it is final and appealable without the necessity for designation under Section (B)."

The first circuit has made similar findings. See, *Block v. Bernard, Cassisa, Elliott & Davis*, 04-1893 (La.App. 1 Cir. 11/4/05), 927 So.2d 339, where a judgment sustaining the defendant attorneys' peremptory exception of no cause of action in an action against the attorneys, their client, and another, was a partial final judgment that was immediately appealable and did not require the trial court's certification of the judgment as final for appeal where the judgment dismissed the attorneys from the litigation. La.Code Civ.P. arts. 1911, 1915(A and B).

To bolster its argument that the third circuit has remained inconsistent with other circuits, Dixie argues that *Boutte v. Fireman's Fund County Mutual Insurance Co.*, 06-34 (La.App. 3 Cir. 5/10/06), 930 So.2d 305, *writs denied*, 06-1482, 06-1484 (La. 9/29/06), 937 So.2d 864, supports its position. However, in *Boutte*, the trial court had, in an overt act, refused to designate the judgment dismissing Eva Bernal on summary judgment as a final judgment, by marking out the paragraph inserted by her for that purpose. The Bernal judgment was consistently referred to

as an interlocutory judgment, apparently even by Bernal, and there is no evidence in the decision that she argued La.Code Civ.P. art. 1915(A). Additionally, while that decision does not discuss the language in that appellant's motion for an appeal, or whether she asked for and obtained an order granting her an appeal of the earlier Bernal judgment, the decision does refer to "an unrestricted appeal" which allows the party to seek review of adverse interlocutory rulings when appealing the final judgment, which is not the case herein.

Dixie further argues that, even if a judgment can be appealed immediately, it can also be held until the final judgment determining the merits for all parties. If Dixie's argument were correct, there would be no need for statutes setting forth delay periods at all. "An appeal is taken *by obtaining an order therefor, within the delay allowed*, from the court which rendered the judgment." La.Code Civ.P. art. 2121 (emphasis ours). Moreover, in this case, contrary to Dixie's assertion, Dixie did not obtain an order to appeal the 2005 Langley judgment. Dixie obtained an order to appeal the February 2008 judgment only. More specifically, Dixie's April 7, 2008 "Notice of Devolutive Appeal" states that Dixie

> intends to appeal the February 6, 2008 Final Judgment granting the Motions for Summary Judgment filed on behalf of New York Life Insurance and Nutmeg Insurance Company. These Motions for Summary Judgment, in connection with the prior judgments rendered by the court, resulted in the complete dismissal of Dixie Chris Omni, LLC's claims.

> The Clerk of Court mailed the Notice of Signing of Judgment on February 8, 2008; and this Notice of Appeal is timely per Louisiana Code of Civil Procedure Article 2087.

We disagree with Dixie that the language, "in connection with the prior judgments," converts this limited motion into an all-encompassing, unrestricted appeal that includes all prior judgments. The very next sentence, again providing the

16

February 2008 date upon which the *appealed* judgment was noticed, and the statement of timeliness (sixty-seven days from judgment, per La.Code Civ.P. art. 2087), makes it even clearer that the only judgment Dixie appealed is the February 8, 2008 judgment dismissing Nutmeg and New York Life. This is borne out in the fact that Dixie did not add argument in its appellate brief on all "prior judgments," though there were several. Dixie only sought to add argument to its brief on the Langley and Zurich judgments. Additionally, grammatically speaking, Dixie used a pair of commas to set off the phrase – ", in connection with the prior judgments rendered by the court," – indicating that this phrase is not essential to the meaning of the sentence.

Accordingly, the trial court's order granting Dixie's appeal "*upon considering the Notice of Devolutive Appeal*" could not grant an appeal not sought (emphasis added). Without an order of appeal on the added judgments, we have no jurisdiction to hear the appeal as to those judgments. With regard to the August 2006 judgment dismissing Langley's liability insurer, Zurich, the same reasoning applies, except that Zurich's dismissal by summary judgment invokes the application of La.Code Civ.P. art. 1915(A)(3) as well as 1915(A)(1).

Based upon the foregoing, the only appeal properly before us is the appeal of the February 8, 2008 judgment dismissing Nutmeg and New York Life. Dixie's assignments of error and arguments addressing the Langley and Zurich judgments are hereby ordered stricken from Dixie's appellate brief.

**The Dismissal of New York Life**

Dixie contends that the trial court erred in granting summary judgment to New York Life. New York Life, it contends, was vicariously liable for the misrepresentations and fraudulent actions and omissions of its agent, Langley. Dixie

alleges that OMNI's deceased CEO, Jeansonne, told Langley that he needed assignments of life insurance proceeds sufficient to fund Dixie's $2,000,000.00 "put option" in the Stock Purchase Agreement *in addition to* immediate coverage of $2,000,000.00 in life insurance proceeds to guarantee Dixie's investment in the event that Jeansonne died and Dixie was unable to, or decided not to, surrender its stock back to OMNI. Dixie alleges that its status as the largest investor warranted more than a guarantee that it could recover its base investment of $2,000,000.00. Rather, Dixie wanted, and Jeansonne promised, a guarantee that would allow it to double its investment, collecting $4,000,000.00 if Jeansonne died.

Therefore, Dixie's position is that the first collateral assignment prepared by Langley on Jeansonne's three personal policies was represented as having a value, standing alone, of $2,000,000.00; and, the second assignment on the $15,000,000.00 OMNI key man policy, was valued at another $2,000,000.00, as it was to fund the "put option" in the Stock Purchase Agreement. An assignment on the OMNI key man policy was to be extended to each and every investor in an amount consistent with each person's investment.

Dixie, therefore, contends that both assignments prepared by Langley and given to Jeansonne were worthless at the time that they were signed because they did not provide the $4,000,000.00 in guarantees that Dixie was led to expect in exchange for its $2,000,000.00 investment. Dixie alleges that, as to the first assignment, the three personal policies on Jeansonne's life, with policy numbers 44654759, 44673895, and 42927534, were represented to him as having a value of $2,000,000.00 when they actually had a total value of only $850,000.00. As to the second assignment, which Dixie concedes is not at issue, but proceeds to argue in any event, Dixie alleges that it was based not upon an existing policy, as represented by

18

Jeansonne, but upon an *application* for a $15,000,000.00 policy that was never accepted or written by New York Life. Dixie further asserts that this assignment was "bogus" because there was no policy number listed to connect the assignment with the insurance guaranty.[3]

Dixie asserts that Langley participated extensively, aiding and abetting Jeansonne in the above fraudulent misrepresentations through: discussions with OMNI and Jeansonne regarding the assignments; preparation of the OMNI application for the $15,000,000.00 policy; processing the application and assignments; choosing inappropriate assignment forms; leading Toce to believe the three personal policies were worth $2,000,000.00; filling out all documents in his own handwriting; getting Jeansonne's signature; and, delivering the assignments to Toce.

Dixie further alleges that the corporate designee for New York Life testified in her deposition that the first collateral assignment listing the three personal policies of Jeansonne was worthless because Jeansonne died before giving Dixie a separate sworn statement of indebtedness. Dixie asserts that Langley knew that there would never be any such debt of Jeansonne, apparently a reference back to the inappropriateness of the form used for the assignments. However, our review of the record reveals that Langley testified to using the standard form for assignments used by New York Life for his entire career with them, going back to 1986. Moreover, the

---

[3]The second assignment based upon the $15,000,000.00 insurance application is not at issue because, when the amount proved to be above the insurer's limit and was rejected by New York Life, it was replaced with a valid assignment of a new $7,500,000.00 "key man" insurance policy, No. 46859506, on the life of Jeansonne, written by Langley and New York Life. When Jeansonne died, the full proceeds of $7,500,000.00 became available to fund the "put option" in the Stock Purchase Agreement. Under the put option, Dixie and the other investors could have surrendered, or "put" their stock back to OMNI for a return of their investments, in Dixie's case, $2,000,000.00. However, after Jeansonne's death, Dixie and the other investors chose to keep their stock in OMNI and release their assignments on the OMNI policy, resulting in the policy proceeds of $7,500,000.00 going into OMNI, immediately increasing the value of OMNI stock.

New York Life representative, Charmain Goodman, testified that other proof of indebtedness could be used and suggested that the Stock Purchase Agreement might supply proof of indebtedness. She further stated that the manner by which an assignment usually works is that the assignee gets his debt paid off, and the balance would go to the owner of the policy. In this case, it was Jeansonne's former spouse, as beneficiary after Jeansonne died.

In response to Dixie's appeal, New York Life argues that all discovery had been done at the time of the judgment and that there were no genuine issues of material fact regarding Dixie's inability to prevail on its allegations of fraud and misrepresentation against New York Life. New York Life asserts that there was no evidence of fraud by Langley, that New York Life and Langley owed no duty to Dixie for any perceived negligence because their client was Jeansonne, not Dixie; that because there was no duty, there could be no breach; and, that Dixie would not be able to prove damages at trial because it made approximately $4,700,000.00 on its investment in OMNI within the time frame promised by Jeansonne. We find these arguments persuasive.

"Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction." La.Civ.Code art. 1953. The record in this case indicates that a sincere attempt to immediately provide approximately $2,000,000.00 in coverage to the satisfaction of Dixie was made by Langley on October 31, 2000. However, there is no material evidence to support Dixie's claim regarding Jeansonne's promises that coverages and assignments would be stacked to provide Dixie with $4,000,000.00 upon the death of Jeansonne.

20

More specifically, the evidence indicates that Dixie's $2,000,000.00 investment was to be immediately covered by Jeansonne's three personal policies, valued at $850,000.00 ($924,000.00 in registry of court), *and* by a $1,000,000.00 risk binder on the new OMNI key man policy application for $15,000,000.00. The evidence further indicates that, rather than stacking the two assignments, both assignments were temporary bridges for Dixie. These assignments were to be replaced by one $2,000,000.00 assignment on the final key man policy, when issued. Hence, the record materially supports the dismissal of New York Life.

**Deposition of Langley**

Langley testified that he went to Jeansonne's office on the morning of October 31, 2000, and left in the mid-afternoon. The purpose of the meeting was to write a new policy that would cover the investors' return of their money should Jeansonne die. OMNI was applying for a $15,000,000.00 life insurance (key man) policy on Jeansonne, on which OMNI would be the beneficiary. Medical personnel came to OMNI's offices on October 31st to do a physical on the 40-year-old Jeansonne for that purpose. During the day, Langley met with Toce for roughly fifteen minutes in the morning and fifteen minutes in the afternoon. In the conference room with Toce and two others (likely his financial advisor, DeHart, and possibly his attorney, Anjier), Langley talked with them about $2,000,000.00 in coverage immediately *while* the $15,000,000.00 policy was being written.

Langley testified that Jeansonne asked him in front of Toce whether he had enough insurance to cover Dixie's $2,000,000.00. Langley told Jeansonne that he did not, because the $2,000,000.00 that he had belonged to the children's trust, and another family member would have to sign, which made it unavailable. Langley testified that he did tell Jeansonne in front of Toce that the three policies that were

21

ultimately used for the first assignment totaled $850,000.00 and that Faye Jeansonne was the beneficiary on those. They did not discuss her signature on the assignment because, while Faye was the beneficiary, the policies belonged to David Jeansonne, and he could have changed the beneficiary any time he chose. According to Langley, Jeansonne said that the $850,000.00 on the three personal policies was enough because that amount plus the $1,000,000.00 binder on the new policy came to almost $2,000,000.00. Langley stated that this was fine with Toce. As to the process, Langley testified that once the physical examination was done on October 31st, the company would go on risk for $1,000,000.00 until the full coverage was written on the $15,000,000.00. He further testified that he told Toce that the second assignment was for $1,000,000.00.

Langley indicated in his deposition that he understood that the first assignment of Jeansonne's personal policies, for $850,000.00, was temporary, from the actions of Toce himself. He stated that he explained to Toce that the policies were Jeansonne's personal policies and that they had cash accumulated value, but Toce said that he did not want them. Langley thought that the assignment was temporary, that the new assignment would replace the old assignment, and that Toce would get the $2,000,000.00 assignment on the OMNI "key man" policy when it was written. Langley stated that he did not know of the other investors on October 31, 2000, but once the OMNI policy was written, each investor received an assignment equal in value to his investment on that policy.

Langley testified that he left OMNI's offices between 3:00 and 4:00 o'clock in the afternoon on the 31st and took the application for the $15,000,000.00 OMNI policy to the Baton Rouge office. From there it was sent to Dallas. However, as a result of the turn of events, New York Life would not write the $15,000,000.00

policy, though it did write a policy for $7,500,000.00, which was more than enough to fund the "put options" on the Stock Purchase Agreement, covering the initial investments of all investors, including Dixie's $2,000,000.00 investment. After Jeansonne's death in the plane crash a few months later, the investors released their assignments on the OMNI key man policy. New York Life then paid OMNI the proceeds of that policy.

Because of the influx of $7,500,000.00 from the OMNI policy, OMNI stock was more valuable. Dixie had opted to keep its OMNI stock, instead of surrendering it under the "put option" for a return of the initial $2,000,000.00 investment. As a result, within a few years, by March 2004, Dixie had sold its stock in OMNI for well over $4,000,000.00. In fact, Toce admitted in his deposition that he had more than doubled his initial investment in OMNI stock.

Dixie conceded that the second assignment on the $15,000,000.00 "key man" policy application was not at issue, because it was replaced by a valid assignment when the $7,500,000.00 policy was actually written in November 2000.[4] Nevertheless, Dixie argues that misrepresentations were made on October 31, 2000, about the $15,000,000.00 policy, and that the assignment on it was "bogus" because there was no policy number written in the blank provided on the assignment form. Dixie indicates that it did not know that the policy had not yet been written, even though medical people were in the building giving a physical examination to Jeansonne for the purpose of immediately binding $1,000,000.00 of coverage based upon the new policy application. However, the attorney with Toce, Anjier, testified that he was aware that a nurse was present performing a physical on Jeansonne for the

---

[4] After Jeansonne died in the plane crash in February 2001, New York Life paid OMNI the $7,500,000.00 in proceeds on OMNI's "key man" policy, and put the proceeds of $850,000.00 plus, on the three personal policies, in the registry of the court. Dixie has conceded that as to all of the policies, Dixie has no claims against New York Life. The only claim against New York Life is the claim of vicarious liability for the acts of Langley.

application on the *new* policy that *would be written* to fund the put option in the Stock Purchase agreement.

Ms. Charmain Goodman, the corporate representative for New York Life, testified that an assignment without a policy number would nevertheless be a permissible assignment if the assignment had attached a temporary conditional coverage agreement. This did not happen in this case because the policy amount of $15,000,000.00 was above what New York Life was willing to bind, and that assignment was never submitted. However, having an application rejected by New York Life did not rise to the level of fraudulent conduct.

New York Life posits that, rather than stacking two assignments for $2,000,000.00 each, the intention was always to guarantee the return of one $2,000,000.00 investment to Dixie. This was to be accomplished by exchanging the October 31, 2000 assignment on the three personal policies (ultimately worth $924,000.00) and the intended assignment on the $1,000,000.00 binder on the OMNI key man policy, for a $2,000,000.00 assignment on the actual key man policy when it was delivered. This position is further supported in Langley's testimony that, on November 28, 2000, when he delivered the $7,500,000.00 policy, he brought a collateral assignment release form to Jeansonne for Dixie to release the assignment on Jeansonne's three personal policies. Jeansonne told Langley to give the release to Burt Zaunbrecher, OMNI's executive vice president, to handle the release by Dixie. This understanding of an exchange theory or bridge theory is supported in the record by those other than Langley.

Zaunbrecher, who invested $250,000.00 in OMNI during these negotiations, was present at the meeting on October 31, 2000. He testified that he was asked to leave the room several times, as there were negotiations going on with

24

Dixie and Advantage Capital as well. Zaunbrecher did not know who Langley was but did recall Toce asking Jeansonne whether OMNI had key man insurance on him. Jeansonne replied that they would get some coverage. Zaunbrecher further testified that "it was recognized that it would take some time to procure the coverage," indicating again the application on the OMNI key man policy. He also testified that Jeansonne offered his personal policies to Toce and that is when Zaunbrecher was asked to leave the room. Zaunbrecher stated that, later, when the key man coverage was in place, he recalled Jeansonne asking him to contact Toce to determine if he could get Toce to release the collateral assignment on the personal policies.

Zaunbrecher testified that he assumed, now that the key man coverage for $7,500,000.00 was in place, that Toce would release the assignment on the personal policies. He recalled at some point, probably in December 2000, getting release forms from Langley for that purpose. Accordingly, this testimony indicates that Zaunbrecher thought that the personal assurances that only Dixie got were a temporary bridge until the OMNI key man policy was issued.

In his affidavit, Zaunbrecher stated that he believed that the personal policies were sufficient to cover Dixie's $2,000,000.00 investment, rather than having a value of only $850,000.00. Zaunbrecher admitted that he was not in the room at the time, and he made no reference to the second assignment given to Dixie on the intended binder of $1,000,000.00 on the key man policy application. One must ask, why would Dixie be given an assignment on a $1,000,000.00 risk binder on a new key man policy application, in addition to an assignment on three personal policies, if the personal policies themselves would cover his $2,000,000.00 investment?

One logical explanation is that Dixie got both the risk binder assignment and the personal policies assignment, collectively worth just under $2,000,000.00, as

25

immediate and temporary collateral for its investment, while and until the "key man" policy could be underwritten and delivered. When this was done, a new replacement assignment for $2,000,000.00 on the "key man" policy would be provided. We also note that Dixie states in paragraph ten (10) of at least three of its pleadings that the assignments were "temporary" assignments to ensure that Dixie received a $2,500,000.00 return on its investment. Toce stated in his deposition that the $2,500,000.00 should have been a $2,000,000.00.

The attorney at the meeting working on the Stock Purchase Agreement for Dixie, Anjier of Liskow & Lewis, testified regarding the "key man" application. Anjier stated that he was aware that "Mr. Jeansonne was going to assign his *personal policies to secure "the put" until such time* that the company obtained its own coverage." (Emphasis added). Anjier testified that insurance assignments to fund "the put" was what was negotiated as part of the Stock Purchase Agreement and that he was not aware of any other assignment agreements. Hence, Dixie's own attorney believed that the assignments were to be exchanged, not stacked so as to provide Dixie with $4,000,000.00 in life insurance.

Dixie's CPA and financial advisor at the meeting with Toce, DeHart, drafted a memo shortly after the October 31, 2000 meeting. He stated that he believed the assignment on the personal policies of Jeansonne was to be *replaced* by an assignment on the "key man" policy when it was issued. DeHart did say that he believed that the personal policies were themselves valued at $2,000,000.00, without reference to the intended binder of $1,000,000.00 on the "key man" application, which was the subject of the second assignment given that day. However, what is important here is that the replacement did occur. When the key man policy for

$7,500,000.00 was issued the following month, Dixie received an assignment on it equal to the value of his investment.

DeHart stated in his affidavit that Jeansonne summoned Langley at 9:00 p.m.[5] to meet with him and Toce to provide assignments of life insurance policies sufficient to guarantee Toce's investment, and that Langley assured Toce that the life insurance policies fulfilled Jeansonne's promises of security. DeHart's testimony in this regard is not materially adverse to New York Life's position that the $1,000,000.00 intended risk binder on the key man policy application, written and submitted earlier in the afternoon by Langley, along with the $850,000.00 (plus accumulated cash value) assignment on the personal policies, together would have covered almost all of Toce's investment. Moreover, DeHart also stated in his affidavit that on the night of October 31st, Toce received certain rights and options and "*key man insurance* with Dixie as beneficiary *in exchange for a $2,000,000.00 investment*." Dixie was never the beneficiary on any insurance policy on the life of Jeansonne.

The foregoing testimony by Zaunbrecher, DeHart, and Anjier supports the position of New York Life that there was no fraudulent conduct by Langley. In fact, none of those gentlemen recalls statements by Langley or discussions in his presence regarding the value of the personal policies. The key man policy was issued as promised in an amount sufficient to fund the "put option." Dixie received an assignment on the policy; the policy proceeds were paid upon death as promised; and, the proceeds were available to fund the "put option." Additionally, Toce himself

---

[5] Toce testified that he met Langley for the first time between 10:00 and 11:00 p.m., and DeHart gave testimony that Langley "came back" at 9:00 p.m. on October 31, 2000, to deliver the assignments. This is in conflict with Langley's testimony that he did not come back that night after leaving in the afternoon. Anjier testified that he thought Langley came to the meeting in the afternoon. The disputed facts regarding the time that one of the meetings took place is immaterial in this case, where the negotiations began at 9:00 a.m. and ended at midnight on October 31st.

27

stated in his deposition that Langley brought in the assignments and handed them to Langley's client, Jeansonne, not to Toce. Jeansonne introduced Langley, signed the documents, and shook Langley's hand. Langley left the room. According to Toce, who said that was the "whole universe" of what Langley did, Langley did nothing to mislead Toce. Moreover, Toce testified that Langley was not in the room when Jeansonne made representations to Toce about the value of the policies. Therefore, we find no evidence of fraud on the part of Langley, nor the possibility that fraudulent conduct could be proven at a trial on the merits.

Langley testified that he informed Jeansonne immediately regarding the rejection by New York Life of the $15,000,000.00 application and said he would come back over to re-do the second assignment, but Jeansonne told him not to worry about coming back over. Langley, therefore, did not replace that assignment until the $7,500,000.00 key man policy was issued. New York Life argues that Langley had no contractual or legal or assumed duty to Dixie. We agree. Langley's client was Jeansonne, not Dixie; Langley's interaction with Dixie was extremely brief, and Langley was not involved in the negotiations between Jeansonne and Toce. Moreover, Toce was an attorney who had Dixie's CPA and Dixie's attorney with him in the OMNI building during the negotiations.

"To find fraud from silence or suppression of the truth, there must exist a duty to speak or to disclose information." *Greene v. Gulf Coast Bank,* 593 So.2d 630, 632 (La.1992). There a bank owed no duty to disclose credit of borrower to investor/shareholder/guarantor where investor had two undergraduate degrees and a masters degree in engineering physics, was familiar with corporations and financing, and was aware of the company's debt before he made his investment. *Greene* also found no special relationship that would create a duty. Nor do we find any special

relationship between Langley and Dixie that would create a duty on the part of Langley. Moreover, Dixie has conceded that the assignment on the key man policy is not at issue.

With regard to any acts of Langley that could be construed as negligence toward Dixie on the first assignment of the Jeansonne policies, as opposed to fraudulent acts or omissions requiring intent, we again find that Langley owed no duty to Dixie. There obviously was no contractual relationship between Langley and Dixie. Moreover, as Dixie has asserted, its claims are in tort, not contract. Just as a tortfeasor's insurance agent owes no duty to the tort victim to secure a certain amount of insurance coverage (See, *Elmore v. Kelly*, 39,080 (La.App. 2 Cir. 12/15/04), 889 So.2d 1173), we find that Langley had no duty to discover secret or unknown statements that his insured might or might not have made regarding the amount of existing coverage. Langley simply had no role in initiating the purchase or the sale of the OMNI stock.

Moreover, Langley testified that he had the personal policies with him on the 31st, that he told Jeansonne in front of Toce that the policies totaled $850,000.00, and that when he spoke to Toce about the policies having accumulated cash values, Toce indicated that he did not want them. Toce is not an unsophisticated investor, and he was accompanied during the negotiations by Dixie's CPA, DeHart, and by Dixie's attorney, Anjier. Yet, he failed to investigate or ascertain the value of policies that he himself requested while making the very sizable investment on behalf of Dixie of $2,000,000.00. Now Toce, as owner of Dixie, seeks to hold an insurance agent liable for Toce's own missteps or misunderstandings. We find no duty on the part of Langley that precludes summary judgment in favor of his

29

employer. Accordingly, we find no error in the trial court's dismissal of New York Life on summary judgment.[6]

**The Dismissal of Nutmeg**

Dixie asserts that the trial court erred in granting Nutmeg's motion for summary judgment on the issue of duty. Nutmeg is the liability insurer for the directors and officers (D&O) of OMNI. In addition to claims of fraud against the estate of David Jeansonne, Dixie alleged a negligent supervision claim against two directors of OMNI, William W. Rucks, IV and John H. Untereker. It asserts a breach of duty to Dixie, as a new stockholder, to oversee Jeansonne and to "peruse" the documents resulting from the negotiations on October 31, 2000.

We will first discuss Nutmeg's liability for the actions of Jeansonne. As a threshold matter, however, we will address no further analysis to the second assignment on the OMNI key man policy application[7] that was written on October 31, 2000, because that failed assignment was replaced and funded without damage to anyone as a result of the temporary lapse, and Dixie has conceded that it is not at issue. With regard to whether Jeansonne committed fraud on the first assignment of his three personal policies, by allegedly misrepresenting to Toce that their total value was $2,000,000.00, rather than the $850,000.00, Nutmeg argues that its policy specifically excludes fraud as a covered claim. The language in Nutmeg's Hartford policy states under section "V. Exclusions" that the insurer shall not be liable for a

---

[6]New York Life also included argument on Dixie's failure to prove damages, where Dixie disposed of its OMNI stock in approximately three years and received over $4,700,000.00 for the stock. Because, we find no duty or breach by New York Life, any damages that Dixie did or did not sustain cannot be attributed to New York Life. Accordingly, we will not address damages.

[7]Langley testified that when he told Jeansonne that New York Life would not write the $15,000,000.00 policy and that he needed to come back to OMNI's office to write a new assignment, Jeansonne told Langley not to worry about coming back. Shortly thereafter, the OMNI "key man" policy was written by New York Life for $7,500,000.00, the "put option" was funded, and a valid assignment was provided to each investor according to his investment.

loss in connection with any claim against its insured directors and officers "(J) for, based upon, arising from, or in any way related to any deliberately dishonest, malicious or fraudulent act or omission or any willful violation of law. . . ." We agree. This argument has merit. The Nutmeg policy clearly excludes fraudulent acts. Therefore, Nutmeg cannot be held liable for any fraud alleged against Mr. Jeansonne.

With regard to any claims of negligent misrepresentations made by Jeansonne, Nutmeg argues that Jeansonne's assignment of his personal policies was done in his personal capacity, which their policy does not cover. More specifically, Nutmeg's policy defines a covered, "Wrongful Act" at section IV.(O) as "any actual or alleged error, misstatement, misleading statement, act, omission, neglect or breach of duty, committed or attempted by the Directors and Officers, *in their capacity as such. . . .*" (emphasis added). We agree that any negligent misrepresentations alleged against Jeansonne for statements made regarding his personal assurances and his personal policies are not covered in Nutmeg's policy. Dixie argues that Jeansonne also acted in his official capacity when he signed the Stock Purchase Agreement and the assignment to fund the "put option." However, as previously stated in this opinion, the assignment on the key man policy to fund the "put option" ultimately succeeded and is not at issue.

We now address Nutmeg's liability for the allegedly negligent actions of the directors, Rucks and Untereker, who were not present during the negotiations on October 31, 2000, but against whom Dixie asserts a breach of duty to supervise Jeansonne and to "peruse" documents resulting from the negotiations on October 31. Dixie asserts as authority for the directors' duty to it as a shareholder, *the first half of the first sentence* of La.R.S. 12:91, which provides *in full* as follows:

31

**La.R.S. 12:91. Relation of directors and officers to corporation and shareholders**

A.  Officers and directors shall be deemed to stand in a fiduciary relation to the corporation and its shareholders, and shall discharge the duties of their respective positions in good faith, and with that diligence, care, judgment, and skill which ordinary prudent men would exercise under similar circumstances in like positions; however, a director or officer shall not be held personally liable to the corporation or the shareholders thereof for monetary damages unless the director or officer acted in a grossly negligent manner as defined in Subsection B of this Section, or engaged in conduct which demonstrates a greater disregard of the duty of care than gross negligence, including but not limited to intentional tortious conduct or intentional breach of his duty of loyalty.  Nothing herein contained shall derogate from any indemnification authorized by R.S. 12:83.

B.  As used in this Section, "gross negligence" shall be defined as a reckless disregard of or a carelessness amounting to indifference to the best interests of the corporation or the shareholders thereof.

C.  A director or officer who makes a business judgment in good faith fulfills the duty of diligence, care, judgment, and skill under Subsection A of this Section if the director or officer:

(1) Does not have a conflict of interest with respect to the subject of the business judgment.

(2) Is informed with respect to the subject of the business judgment to the extent the director or officer reasonably believes to be appropriate under the circumstances.

(3) Rationally believes that the business judgment is in the best interests of the corporation and its shareholders.

D.  In fulfilling his duties under this Section, a director or officer is entitled to rely upon records and other materials and persons as specified in R.S. 12:92(E).

E.  A person alleging a breach of the duty of diligence, care, judgment, and skill owed by an officer or director under Subsection A shall have the burden of proving the alleged breach of duty, including the inapplicability of the provisions as to the fulfillment of the

duty under Subsections C and D and, in a damage action, the burden of proving that the breach was the legal cause of damage suffered by the corporation.

Based upon the foregoing, Dixie would have to allege and prove "gross negligence" against the directors under La.R.S. 12:91(A). It did not do so at the summary judgment level. Based upon the record, it could not have done so at a trial on the merits. As a factual matter, there is nothing in the record to support such a claim. Rucks himself invested $250,000.00 in OMNI, receiving the same assignment and "put option" that Dixie received, but in the amount of his smaller investment, and not until after the OMNI key man policy was written, without any bridge assurances and assignments to protect him until the key man policy was written. With regard to duty, if the Nutmeg policy does not cover the personal acts of Jeansonne, how could there be a duty by directors Rucks and Untereker to oversee a personal assignment given by Jeansonne outside their presence? Moreover, the collateral assignment forms used do not supply the amount of the policy or the amount of the assignment. Therefore, examining the documents would not have revealed any underlying falsehoods not apparent in the documents themselves.

There simply is no evidence of gross negligence on the part of Rucks or Untereker, nor is there any evidence sufficient to show that Dixie could be able to prove gross negligence at a trial on the merits. Summary judgment on the issue of duty was properly granted.[8]

---

[8]Dixie further includes inside its assignment of error as to the dismissal of Nutmeg on the issue of duty, that the trial court erred in finding Dixie's failure to "re-serve" Rucks and Untereker, after settling with them and "dismissing" them, as fatal to Dixie's claims under the direct action statute. We disagree, though we are backtracking somewhat in addressing this procedural issue. Dixie argues that it reserved its rights against Nutmeg as the insurer when it agreed in settlement with the directors, to not pursue them personally. However, the Shareholder's Release Agreement of July 2003 provides that the shareholder "agrees, *without releasing any claims*, not to attempt to collect any money" from Rucks and Untereker, "personally."

Nutmeg asserts that Dixie never served Rucks and Untereker, attaching a procedural printout of the district court case, and, therefore, Dixie could not "dismiss" them. Dixie points to no evidence of service. We find that the Release Agreement requires, in its reservation of rights, not releasing

Additionally, La.R.S. 12:91(D) provides that a director or officer is entitled to rely upon records and other materials and persons as specified in La.R.S. 12:92(E) below. Louisiana Revised Statutes 12:91(E) provides that any person claiming breach under (A) must prove the inapplicability of Subsections (C) and (D), which Dixie has not done and could not do. More specifically, La.R.S. 12:92(E) provides as follows:

> E. A director shall, in the performance of his duties, be fully protected in relying in good faith upon the records of the corporation and upon such information, opinions, reports, or statements presented to the corporation, the board of directors, or any committee thereof by any of the corporation's officers or employees, or by any committee of the board of directors, or by any counsel, appraiser, engineer, including a petroleum reservoir engineer, or independent or certified public accountant selected with reasonable care by the board of directors or any committee thereof or any officer having the authority to make such selection, or by any other person as to matters the director reasonably believes are within such other person's professional or expert competence and which person is selected with reasonable care by the board of directors or any committee thereof or any officer having the authority to make such selection.

---

any claims, and that Dixie never perfected its claims against the directors due to a failure to serve them.

The direct action statute, La.R.S. 22:655(B)(1), provides that an action may be brought against the insurer alone only when: (a) the insured has begun bankruptcy proceedings; (b) the insured is insolvent; (c) service of citation or other process cannot be made on the insured; (d) the cause of action is between certain family members; (e) when the insurer is a UM carrier; or (f) the insured is deceased.

None of these enumerated conditions exist as to Rucks and Untereker. Therefore, failure to serve Rucks and Untereker is fatal to the application of the direct action statute herein. See *Etienne v. National Auto. Ins. Co.*, 98-1946 (La.App. 3 Cir. 6/23/99), 747 So.2d 593, *writ granted*, 99-2610 (La. 12/17/99), 751 So.2d 866, *affirmed,* 99-2610 (La. 4/25/00), 759 So.2d 51 (under direct action statute, driver's claim against automobile liability insurer arising out of accident would be dismissed for failure to join insured, where driver did not bring suit against named insured until more than three years after accident, and record did not indicate, and driver did not allege, that any of the circumstances enabling a plaintiff to sue the insurer alone applied). La.R.S. 22:655(B)(1); La.Code Civ.P. art. 927(B); and see, *Brown v. Hiaton*, 03-0155 (La.App. 4 Cir. 12/17/03), 863 So.2d 671 (suit against defendants dismissed on the grounds that they had not been served; La.Code Civ.P. art. 1201 provides that without citation and service, all proceedings are absolutely null; insurer dismissed under direct action statute because none of the enumerated situations existed).

Here, we dovetail into Nutmeg's motion for summary judgment on the Integration Clause, wherein Nutmeg asserts that Rucks and Untereker are protected in their reliance upon the provisions in the Stock Purchase Agreement. According to La.R.S. 12:92(E) above, Nutmeg is correct. Specifically, the Integration Clause is located at page 18, Section IV.(B) of the Stock Purchase Agreement and provides as follows:

> (B) This Stock Purchase Agreement constitutes the entire agreement among the parties hereto with respect to the subject matter hereof and supersedes any and all prior or contemporaneous agreements and understandings in connection therewith. This Stock Purchase Agreement may be amended only by a writing executed by all parties hereto.

Page 14 of the Stock Purchase Agreement memorializes the "put option," the provision for the key man policy and the coverage of Dixie's $2,000,000.00 investment, but does not memorialize the assignment of the personal policies of Jeansonne, or any of the extra assurances allegedly given Dixie by Jeansonne. Accordingly, Rucks and Untereker are protected under La.R.S. 12:91 and 12.92, which allows them to rely on the Stock Purchase Agreement's Integration Clause forbidding outside agreements.

Dixie argues that Rucks and Untereker were not parties to the Stock Purchase Agreement and, therefore, cannot rely upon it. We disagree. The Stock Purchase Agreement is a record of the OMNI corporation. We fail to see the logic in Dixie's argument. Dixie cannot argue that Rucks and Untereker had a duty to discover and peruse a personal assignment of Jeansonne's, and then ignore the OMNI Stock Purchase Agreement executed by Jeansonne as president and CEO of OMNI.

Finally, Dixie argues that where fraud is alleged, no Integration Clause can alleviate a defendant's responsibility for damages caused by fraud. Dixie

overlooks the fact that fraud is not alleged against directors Rucks and Untereker, and Nutmeg's policy excludes fraud as a covered claim. Accordingly, given the arguments, the facts and circumstances of this case, and the status of available information at the court's disposal at the time of the February 2008 judgment, we find that the trial court did not err in granting summary judgment to Nutmeg on the issue of the Integration Clause in the Stock Purchase Agreement.

Nutmeg filed a motion for summary judgment or partial summary judgment on the issue of damages. The trial court granted summary judgment on the issue of damages in the same February 2008 judgment wherein it granted summary judgment in favor of New York Life and granted summary judgment to Nutmeg on the issue of duty and on the Integration Clause. We have found that Nutmeg's policy specifically excludes any intentional and fraudulent actions of Jeansonne and does not cover any personal actions of Jeansonne resulting in negligence. We have further concluded that Rucks and Untereker did not have a duty to discover alleged oral promises and representations made by Jeansonne in a personal capacity that could not be detected from the records and documents filed with OMNI. We have, moreover, found that Rucks and Untereker are protected by La.R.S. 12:91 and 12:92 in relying upon the Integration Clause in the Stock Purchase Agreement. We have determined a lack of any evidence pertaining to gross negligence in their duties to shareholders and to the corporation. Thus, we find it unnecessary to address damages and its

attendant issues.[9] Any damages that Dixie may or may not have sustained cannot be imputed to Nutmeg.

IV.

**CONCLUSION**

Based upon the foregoing, the February 2008 judgment dismissing New York Life Insurance Company and Nutmeg Insurance Company is hereby affirmed. All costs of this appeal are assessed to Appellant, Dixie Chris Omni, L.L.C.

**AFFIRMED.**

---

[9]Dixie questionably attempted to apply the collateral source rule in opposing the defendants' assertions that Dixie had doubled its investment with OMNI and therefore suffered no damages. Dixie also argued that life insurance proceeds come under the description of *sui generis*, are due on death, without application of our Civil Code articles, and that it was fraudulently deprived of $2,000,000.00 in life insurance proceeds, which are its damages. Dixie makes no reference however, to the fact that approximately $924,000.00 was paid by New York Life on the three personal policies of Jeansonne, upon which Dixie had an assignment; yet Dixie did not take its case to trial on those life insurance proceeds and argue *sui generis*, but rather settled with Faye Jeansonne for just twenty percent (20%) of that amount. The argument of Faye Jeansonne in her motion for summary judgment prior to settlement was that Dixie's assignment was not valid because Dixie did not take delivery of the policies. Langley testified that when he talked to Toce about the personal policies, in his briefcase, and their accumulated cash value, Toce indicated that he did not want the policies.